U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2001 MAR 15  A II: 42

FILED
IN CLERK'S OFFICE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ROBERT and LINDA HARRIS,

    Plaintiff

    v.

ATHOL-ROYALSTON REGIONAL
SCHOOL DISTRICT COMMITTEE;
PENELOPE KLEINHANS, individually and in
her capacity as superintendent of schools;
and STEVEN BUXTON, PAUL GUIMOND, and
CARLA RABINOWITZ, individually and in their
capacities as members of the Athol-Royalston
Regional School District Committee

    Defendants

CA No. 99-40164NMG



\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### SECOND AMENDED COMPLAINT
### AND
### DEMAND FOR JURY TRIAL

#### Introduction

1.  Since 1995, when the Plaintiffs settled Robert Harris' First
Amendment lawsuit against the Athol-Royalston Regional School District,
the District and its agents have engaged in continuing retaliation for their
lawsuit, and in threats, intimidation and coercion intended to chill the
Plaintiffs' further exercise of their First Amendment rights.  They bring this
suit for damages, for declaratory and injunctive relief, and for all other
appropriate remedies, pursuant to the First and Fourteenth Amendments to
the Constitution of the United States, Part 1, Article XVI of the
Massachusetts Constitution, 42 U.S.C. §1983, the Massachusetts Civil Rights
Act, G.L. c. 12 §11I, and other applicable law.

## Parties

2.  Robert J. Harris (Robert) is an individual residing in Royalston, Worcester County, Massachusetts.

3.  Robert is the Fine Arts Department Chair, Secondary School Music Director and High School Music Teacher for the District.  He has been employed by the District since September, 1985.

4.  Robert has served as the President of the Athol Teachers Association (ATA or the Union) since July 1, 1993.

5.  Robert is also employed part-time as a consultant by the Massachusetts Teachers Association.

6.  Linda Harris (Linda) is an individual residing in Royalston, Worcester County, Massachusetts, and is the wife of Robert Harris.  She has been employed by the District since September, 1987.

7.  Linda is the Middle School Computer Coordinator and Computer teacher of the District.  She is a former mathematics teacher and team leader in the Athol Middle School, and has been a building representative of the ATA within her school building from October, 1997 to the present.

8.  The Athol-Royalston Regional School District (District) is a body politic and corporate pursuant to G.L. c. 71 §§16, having a principal place of business at 250 South Main Street, Athol, Worcester County, Massachusetts. towns of Athol and Royalston, Massachusetts.

9.  The Athol-Royalston Regional School District Committee of the District (School Committee) is the elected body having general charge of the public schools of the District pursuant to G.L. c. 71 §16A.

10.  Penelope Kleinhans (Kleinhans, or the Superintendent) is an individual residing in Athol, Worcester County, Massachusetts, who at all

relevant times was the Superintendent of the Athol-Royalston Regional School District (District).

11. Carla Rabinowitz is an individual residing in Royalston, Worcester County, Massachusetts.

12. From approximately April, 1989 through the present, Carla Rabinowitz has been a member of the School Committee.

13. Paul Guimond (Guimond) is an individual residing in Royalston, Worcester County, Massachusetts.

14. From April, 1995 through April, 1997, and since April, 1999, Guimond has been a member of the School Committee.

15. Steven Buxton (Buxton) is an individual residing in Athol, Massachusetts.

16. Buxton was a member of the School Committee from April 1996 until April 6, 1999.

### Facts

17. In 1989, Robert filed suit against the District and then-Superintendent James P. Kelley, Worcester Sup. Ct. No. 89-2233 (the 1989 litigation) for his demotion as Department Chairman and other adverse personnel actions by the District, allegedly in retaliation for Harris' protected speech.

18. The suit was settled prior to trial by an agreement of the parties (the Settlement Agreement) dated February 28, 1995:

19. The agreement provides, in pertinent part:

> The School Committee agrees that neither it, nor its agents, attorneys, representatives, successors and assigns and all those in privity with it, shall retaliate against Mr. or Mrs. Harris on account of the Lawsuit or the settlement thereof. This agreement in no way constitutes a restriction of any kind or to any extent

> on the authority of the School Committee to take any
> future action with respect to Mr. Harris' or Mrs.
> Harris' employment which is otherwise lawful and is
> taken in good faith.

20. The agreement also provided for a payment to Robert by the Defendants in the amount of $78,000.00. Linda was a party to the settlement agreement. The settlement was widely publicized in the media. It was also publicized in the local media that the District had failed to notify its insurer of the claim in a timely fashion and was therefore required to pay the settlement funds out of its own accounts.

21. Upon information and belief, during the process of settling the lawsuit, the District apprised Kleinhans, who was being considered for the Superintendent position, of developments in the lawsuit, and of the settlement.

22. Following the Settlement Agreement, the Harrises continued to be employed by the District.

23. Kleinhans was hired as Superintendent of the District on February 15, 1995, and began working in that capacity on or about March 28, 1995.

24. In or about April, 1995, during her first official meeting with Robert in her capacity as Superintendent, and on divers subsequent occasions, Kleinhans asked Robert to step down as Union president because of his protected speech, petitions to the government for redress of grievances and other protected activities.

25. During the negotiation of and following the Settlement Agreement, the Harrises engaged in speech on issues of public concern and petitioned the Massachusetts Department of Education, the Office of the Secretary of the Commonwealth, the Office of the Inspector General of the Commonwealth, the Massachusetts Environmental Protection Agency, the

Athol Board of Health, the School Committee and other government agencies for redress of grievances. Their speech and petition activities included but were not limited to the following:

a.   On or about July 13, 1994, Linda made a presentation to the School Committee regarding the lack of services provided to students within the Middle School Guidance Program.

b.   In or about November, 1994, Linda contacted an officer of the Commonwealth Department of Education (DOE) to file a complaint about the District's violation of laws and regulations of the Commonwealth relating to the education of children with special needs.

c.   On or about March 6, 1995, Linda wrote a letter to the editor of the Athol Daily News publicly criticizing false and/or misleading public statements by her school principal, Robert Gouvin (Gouvin) published in the Athol Daily News, concerning the above complaint.

d.   In or about May, 1995, Linda informed Kleinhans in a private meeting that Gouvin had charged at her and shoved her, and that she was contemplating seeking a complaint for assault from the District Court.

e.   On or about May 20, 1996, Robert reported to Kleinhans in a private memorandum that an Assistant Principal at the Middle School was not certified nor had certification been waived by the DOE, as required by G.L. c. 71 §38G.

f.   On or about May 22, 1996, Robert attended a faculty meeting concerning "block scheduling," which had been a matter of significant public debate and school committee attention as a result of "time and learning" requirements imposed on public schools by the DOE pursuant to the Education Reform Act of 1993.

g.   In or about July, 1996, Robert filed a written report with the DOE regarding the employment of an uncertified middle school principal who was not employed on a waiver, an apparent violation of G.L. c. 71 §38G.

h.   On September 3, 1996, after requesting copies of the Superintendent's contracts for her first and second years of employment with the District, which are public records, from the Chair of the School Committee on July

18 and August 6 and 22, 1996, and receiving no response, Robert wrote to the Secretary of State's Office to request assistance in obtaining the documents.

i.      In or about March, 1997, the Superintendent arranged to acquire a disused railroad depot abutting an active Boston & Maine railroad track, with the intent to use the space as a school house for disruptive students requiring alternative education, without any public discussion or vote of the School Committee.  During that month, Robert telephoned the Athol Health Inspector and officials of the Commonwealth Environmental Protection Agency, Division of Occupational Hygiene, and Division of Occupational Safety of the Department of Labor and Workplace Development, to discuss the fact that the building was rodent-infested, contained friable asbestos, and otherwise failed to comply with the State Sanitary Code.  As a result, just days before the school house was scheduled to open, the building was condemned.  This incident was widely publicized in the local media.

j.      During the same period of time, Robert also publicly called the School Committee's attention to the fact that they had not been properly involved, as required by G.L. c. 71 §§16 and 68 in the acquisition of a school building, and were not informed of the acquisition until after the building was acquired.  This incident was widely publicized in the local media.

k.      In or about March, 1997, Robert also prepared, and he and others circulated, a petition concerning a proposal by the School Committee to privatize custodial management services by entering into a contract with Aramark Corporation (Aramark contract).  The petition garnered some 2200 signatures.  This incident was widely publicized in the local media.

l.      On or about March, 19, 1997, at the School Committee's public budget hearing, held in accordance with G.L. c. 71 §38N, Harris and other citizens requested that presentation of the above petition be placed on the next School Committee Agenda.  The School Committee refused to do so.  This incident was widely publicized in the local media.

m.      On or about March 19, 1997,  at the same School Committee public budget hearing, Robert organized and led a peaceful demonstration in opposition to privatization

of educational support services. This incident was widely publicized in the local media.

n.     On or about March 19, 1997, at the same School Committee public budget hearing, Robert questioned various line items of the proposed budget, and was critical of Assistant Superintendent Robert Siminski and School Committee Chair Paul Landry for being unprepared to provide specific information concerning these items, and specifically their inability to identify where the Aramark contract expenditure of $178,000 was contained in the budget. This incident was widely publicized in the local media, and re-broadcast on several occasions on local cable television.

o.     In or about March, 1997, Robert telephoned an official of the DOE and reported that the District had contracted with the Richard Milburn School to provide services for disruptive students who did not qualify under G.L. c. 71B for such services. The Milburn School was a private school not on the registry of DOE-approved contractors for such services. As such, the school was apparently not legally eligible to receive public funding. Robert further reported that the teacher who was to provide services under the contract was not certified. As a result, the contract was not renewed for the 1997-1998 school year. This incident was widely publicized in the local media.

p.     On or about April 19, 1997, following the refusal of the School Committee to place the Aramark issue and other budgetary items on the School Committee agenda for public discussion, Linda filed a written report with the Inspector General of the Commonwealth that the District had entered into the Aramark contract without following bidding procedures required by the laws of the Commonwealth. c. 30B. As a result, the Inspector General ordered that the five-year contract, at $178,000 per year, be invalidated. This was widely publicized in the local media, and re-broadcast several times on local cable television. The success of the ATA in stopping the privatization of custodial management services was publicized in September, 1997 in the National Education Association (NEA) monthly national magazine, "NEA Today."

q.     On or about April 19, 1997, Linda also wrote a letter to the Worcester County District Attorney that the School Committee had violated the open meeting laws by

discussing the possibility of privatizing the district's custodial management services in an executive session. As a result, the District Attorney's office found that the School Committee had violated the open meeting laws. This was widely publicized in the local media.

r.      On or about May 15, 1997, Linda wrote a letter to the editor of Athol Daily News entitled, "Analyze Before You Privatize," presenting an argument against the District's future privatization efforts.

s.      In or about July, 1998, Robert asked the School Committee to investigate a complaint by two parents and two teachers regarding Kleinhans' use of profanity and other aggressive and unprofessional conduct at a school council meeting.

t.      On or about November 3, 1998, Robert sent a facsimile transmission to the General Counsel of DOE requesting that DOE provide a copy of the application filed by the District for waiver of the certification requirement for a principal newly hired by the District, pursuant to G.L. c. 71 §38G.  Robert thereafter provided the Commissioner of Education with information inconsistent with the District's waiver application, and made public statements concerning the inconsistency. As a result, the DOE withdrew the waiver it had granted.  This issue was widely publicized in the local media.

u.      On or about November 11, 1998, Robert wrote to the School Committee criticizing its members for concluding that it was not in their power to resolve a complaint by two teachers and two parents regarding Kleinhans' alleged use of profanity and other aggressive and unprofessional conduct at a school council meeting on May 27, 1998. This was widely publicized in the local media.

v.      In or about November, 1998, Robert issued a statement to the press asserting that incumbent School Committee members would be held accountable for their actions at the polls in the upcoming election.

w.      On December 11, 1998, Robert sent a complaint to the District Attorney regarding an executive session held by the school committee on December 2, 1998 during which those present discussed Robert's character and reputation without notifying him as required by G.L. c. 39 §23B and G.L. c. 30A §11A 1/2.

x.  On or about March 28, 1999, during a Candidates Night, Robert publicly questioned incumbent School Committee Member Buxton, and other candidates for re-election to the School Committee, regarding their voting records with respect to privatization issues.  Buxton was defeated.

y.  On or about April 2, 3 and 4, 1999, Robert responded on cable television to a campaign "infomercial" aired on cable television by Paul Guimond, a nonincumbent candidate for a seat on the School Committee.  In his "infomercial," Guimond made claims regarding Robert's and the Union's alleged lack of support for previous school building proposals, Robert's role in closing down the old railroad depot as a school house, and his filing of numerous, "frivolous" grievances on behalf of the ATA at the expense of students and the taxpayer.  Robert's response refuted these claims.  Guimond ran unopposed on the ballot and was elected.

z.  On or about June 14, 1999, Robert and Linda filed a report with the Athol Police Department regarding the possible theft of documents contained in Robert's confidential personnel records, and other documents relating to him and his employment, from the Central Administrative Office of the District.  They made this report after learning that documents including such records had been delivered anonymously to the offices of the Athol Daily News.

aa.  On the same date, Robert requested that the School Committee conduct an independent investigation of the disclosure of his personnel records to the Athol Daily News, and that the Committee not delegate the investigation to administrative personnel who might be responsible for the disclosure.

26.  Upon information and belief, all of the Harrises' above activities were known to each of the Defendants at all relevant times.

27.  During the same period, the School Committee and Defendants Kleinhans, Rabinowitz, Guimond and Buxton, individually and in their official capacities, acting both directly and through other employees of the School

Committee, have retaliated against the Harrises for their above speech and petitions to the government for redress of grievances by taking actions against the Harrises including but not limited to the following:

a.      Since the settlement of the 1989 litigation, most correspondence between Robert and Linda and  the School Committee and its agents has been forwarded by the latter to School Committee counsel, whether or not it had to do with his union presidency, contrary to its practice with respect to correspondence with other educators employed by the District.

b.      On or before March 25, 1995, a reporter for the Greenfield Recorder received up to four anonymous defamatory letters concerning the Harrises at the office of the Assistant Principal of the Athol Middle School.

c.      On April 14, 1995, Robert Gouvin, the Principal of the Athol Middle School, referred in Robert's performance evaluation to the settlement of the 1989 litigation by commenting, "Mr. Harris is committed to only those issues that promote his own self-interests."

d.      On or about May 3, 1995, Robert Gouvin, charged at Linda and shoved her.

e.      On or about June 14, 1995, despite Linda's contract, dated April 28, 1995, as a middle school teacher and Team Leader for the upcoming (1995-1996)  school year, the Defendants involuntarily transferred Linda to a lower grade without cause, removing her from the Middle School and demoting her from her position as Team Leader.

f.      On May 24, 1996, Assistant Superintendent Robert Siminski (Siminski) placed a written reprimand in Robert's file for questioning why he and another assistant superintendent were at a faculty meeting, when Robert informed him that he did not ask the offending question, and reasonable investigation would have disclosed that he had not done so.

g.      In June, 1996, Kleinhans placed a written reprimand in Robert's file for questioning why Siminski and another assistant superintendent were at a faculty meeting, when Robert informed her that he did not ask the offending question, and reasonable investigation would have disclosed that he had not done so.

h.     On or about May 31, 1996, Robert was involuntarily transferred from the Athol Middle School and assigned full time to the High School.

i.     On or about March 19, 1997, at the School Committee's public budget hearing, Kleinhans publicly condemned Robert's job performance as the Chair of the Music Department in retaliation for his active participation in that hearing, in derogation of established evaluation procedures.

j.     On or about April 16, 1997, Robert was not permitted to present to the School Committee the petition containing 2200 signatures, or to question the school committee concerning the Aramark contract, at an open meeting, notwithstanding that the School Committee had agreed to place these items on the agenda for that meeting.

k.     On or about August 20, 1997, on a motion made by Buxton, the School Committee voted to prohibit employees of the School Department from speaking at School Committee meetings during the public input section of the School Committee meeting agenda.  Although School Committee by-laws require a second vote in order to adopt a new policy, the prohibition was implemented during that same meeting, and was invoked to censor Robert's speech.

l.     In or about September, 1997, Buxton threatened Robert that if he ever questioned him or the School Committee again the way he had questioned Siminski at the March 19, 1997 public budget hearing, Buxton would "jump over the table," and "grab [Robert] by the throat."

m.     In or about February, 1998, Kleinhans directed the High School Principal to place a written reprimand in Robert's file for failing to file reports which he had in fact filed.

n.     On November 17, 1998, in response to Robert's request for information, Kleinhans issued a memorandum to Harris falsely stating that Middle School Principal Carol Curtis had not requested professional status for four teachers, when she had, and that Curtis had previously shared this information with Harris, when she had not. Kleinhans sent copies of the memorandum to the four teachers.  Kleinhans issued this false information to the teachers in order to undermine his role as union leader and to lower his standing in the community.

o.      On or about November 24, 1998, Kleinhans placed a written reprimand in Robert's personnel file stating that she was removing his office telephone, and threatening to discipline him "more severely" in the future, in retaliation for his November 3, 1998 inquiry to the DOE, and in order to prevent him from engaging in future communications with government agencies with respect to District issues.

p.      On December 2, 1998, Rabinowitz, Buxton and others convened an executive session of the School Committee, at which Kleinhans, other school administrators, and School Committee counsel Allan Drachman were present, during which they discussed Robert's character and reputation and considered complaints concerning him, without notice to him and otherwise in contravention of his rights under G.L. c. 39 §23B and G.L. c. 30A §11A1/2.

q.      At the same executive session, upon Drachman's recommendation, the School Committee voted "no confidence" in the "ATA leadership" in response to Robert's November 11, 1998 letter to the School Committee concerning the complaint regarding Kleinhans' conduct at the May 27, 1998 school council meeting; the vote of no confidence in the Union "leadership" was directed at Robert, and was repeated in open session.

r.      On divers occasions between the settlement of the 1989 litigation and the present, Kleinhans and the District have failed and refused to provide Robert with access to and copies of his personnel records, upon his request, to which he is entitled pursuant to G.L. c. 149 §52C and c. 71 §42C, and with other public records to which he is entitled pursuant to G.L. c. 66 §10.

s.      In or about March, 1999, Kleinhans included a derogatory anonymous letter about Robert in information packets supplied to School Committee members in advance of their public meeting, without notice to Robert.

t.      On or about April 11, 1999, Kleinhans, Buxton, Guimond, Rabinowitz, and others met privately and made plans to defame and discredit Robert and to lower his standing in the community for the purposes of effecting his removal as ATA president and otherwise undermining his role as union leader.

u.     On April 15, 1999, Kleinhans demoted Robert by unilaterally eliminating his Kindergarten through 8th grade supervisory duties from his job description.

v.     On or about May 12, 1999, Kleinhans put a "confidential" memorandum to the School Committee, which included derogatory statements about Robert, in information packets supplied to School Committee members in advance of their public meeting, without notice to Robert.

w.     On or about June 7, 1999, upon information and belief, Kleinhans, one or more of the other Defendants, or someone acting at her, or their behest, provided documents which are a part of Robert's confidential personnel records, held by the District, and other derogatory materials, containing inaccurate, misleading and disparaging statements by Kleinhans and others concerning Robert, to the editor of the Athol Daily News.

x.     Despite Robert's and Linda's request, the School Committee has failed to make reasonable, good faith efforts to ascertain who was responsible for disclosing, copying, and or/delivering his above confidential personnel records and other documents regarding his employment to the editor of the Athol Daily News.

y.     On or about June 10, 1999, Robert Siminski informed the editor of the Athol Daily News that Robert Harris could be fired for not putting on a Spring Concert at the Middle School.

z.     Upon information and belief, on or about June 16, 1999, Kleinhans, and/or one or more other Defendants, or someone acting at her, his or their behest followed Linda and/or caused her to be followed to the School District office, where she had an appointment to review her personnel records, and from the office, after she had reviewed her personnel records.

aa.     Upon said review of her personnel records, Linda learned that the District has maintained press clippings concerning the Harrises' 1989 lawsuit in her personnel file.

28. Except with respect to subparagraphs s, v and y of Paragraph 29 hereinabove, Kleinhans was at all times relevant acting within the scope of her employment.

## Claims For Relief

### Count I - First Amendment:  Freedom Of Speech

29. The plaintiff realleges the allegations of Paragraphs One through Twenty-eight above, and incorporates them herein by this reference as if set forth in full.

30. The Plaintiffs' statements and other activities, set forth in Paragraphs 17 and 25 hereinabove, and other, similar statements and activities, constituted speech protected by the First Amendment to the Constitution of the United States and Part 1, Article XVI of the Constitution of the Commonwealth of Massachusetts.

31. The Defendants' acts set forth in Paragraphs 24 and 27 hereinabove, and other, similar conduct, constituted retaliation for the Plaintiffs' protected speech, including Robert's 1989 litigation to vindicate First Amendment rights.

32. As a result of the Defendants' above censorship of and retaliation for the Plaintiffs' protected speech, the Plaintiffs' speech has been chilled, and they have suffered severe emotional distress. humiliation, embarrassment and fear, and injury to their family relationships and to their reputations.

### Count II - First Amendment:  Petition For Redress Of Grievances

33.  The plaintiff realleges the allegations of Paragraphs One through Thirty-two above, and incorporates them herein by this reference as if set forth in full.

34.  Kleinhans has asked Robert to step down as Union president because of his petitions to the government for redress of grievances and other protected activities, including Robert's 1989 litigation to vindicate First Amendment rights.

35.  By their statements and activities set forth in Paragraphs 17 and 25 a-b, g-q, s-u, w, and z-aa, inclusive, above, the Harrises exercised their rights, protected by the First Amendment to the Constitution of the United States and Part 1, Article XVI of the Constitution of the Commonwealth of Massachusetts, to petition the government for the redress of grievances.

36.  The Defendants' acts set forth in Paragraphs 24 and 27 above, and other, similar conduct, constituted censorship of and retaliation for the Harrises' exercises of their right to petition the government for redress of grievances.

37.  As a result of the Defendants' above retaliation for the Plaintiffs' exercises of their right to petition the government for redress of grievances, the Harrises' exercise of that right has been chilled, and they have suffered severe emotional distress. humiliation, embarrassment and fear, and injury to their family relationships and to their reputations.

### Count III - Invasion Of Privacy:  G.L. C. 214 §1b.

38.  The plaintiff realleges the allegations of Paragraphs One through Thirty-seven above, and incorporates them herein by this reference as if set forth in full.

39.  Kleinhans' public condemnation of Robert's performance as a Department head, in derogation of established evaluation procedures, constituted an unreasonable, substantial or serious invasion of his privacy.

40.  The Defendants' above publication of personnel records concerning Robert constituted an unreasonable, substantial, or serious invasion of his privacy.

41.  The Defendants' subjecting Linda to surveillance constitutes a serious, substantial and unreasonable invasion of her privacy.

42.  Siminski's statement to the editor of the Athol Daily News that Robert could be fired for not putting on a spring concert at the Middle School was an unreasonable, substantial or serious invasion of his privacy.

43.  As a result of the above serious, substantial and unreasonable invasions of the Harrises' privacy, they have suffered severe emotional distress, humiliation, embarrassment and fear.

### Count IV - Common Law Civil Conspiracy

44.  The plaintiff realleges the allegations of Paragraphs One through Forty-three above, and incorporates them herein by this reference as if set forth in full.

45.  On April 11, 1999, Defendants Kleinhans, Guimond, Rabinowitz and Buxton formed a common design or agreement to defame and discredit Robert and to lower his standing in the community for the purpose of

effecting his removal as ATA president and otherwise undermining his role as union leader.

46.  Pursuant to the said common design or agreement, the said Defendants took steps including but not limited to the following:

> a      On April 15, 1999, Kleinhans demoted Robert by unilaterally eliminating his supervisory duties from his job description, without complying with the requirements of G.L. c. 71 §41.

> b.      On or about June 7, 1999, upon information and belief, Kleinhans,  one or more of the other Defendants, or someone acting at her, or their behest, provided documents which are a part of Robert's confidential personnel records, held by the District, and other derogatory materials, containing inaccurate, misleading and disparaging statements by Kleinhans and others concerning Robert, to the editor of the Athol Daily News.

> c.      On or about June 10, 1999, Robert Siminski informed the editor of the Athol Daily News that Robert Harris could be fired for not putting on a spring concert at the Middle School.

> d.      Upon information and belief, on or about June 16, 1999,  Kleinhans, and one or more other Defendants, or someone acting at her, his or their behest followed Linda and/or caused her to be followed after she reviewed her personnel file at the School District office.

47.  As a result of the above conspiracy to defame and discredit Robert and lower his standing in the community, the Harrises have suffered severe emotional distress, humiliation, embarrassment and fear.

### Count V - Intentional Or Reckless Infliction Of Emotional Distress

48.  The plaintiff realleges the allegations of Paragraphs One through Forty-seven above, and incorporates them herein by this reference as if set forth in full.

49.  Kleinhans' public condemnation of Robert's job performance at a public hearing on the school department budget, held pursuant to G.L. c. 71 §38N on March 19, 1997, in retaliation for his participation in that hearing was outrageous conduct intolerable in a civilized society.

50.  Buxton's threat to Robert, in or about September, 1997, that if he ever questioned him or the School Committee again the way he had questioned Siminski and Landry at the March 19, 1997 budget hearing, Buxton would "jump over the table, grab [Robert]" and assault him, was outrageous conduct intolerable in a civilized society.

51.  Kleinhans, Buxton, Guimond, and Rabinowitz' private meeting, on or about April 11, 1999, at which they made plans to defame and discredit Robert and to lower his standing in the community for the purpose of effecting his removal as ATA president and otherwise undermining his role as union leader, was outrageous conduct intolerable in a civilized society.

52.  The publication by Kleinhans, Buxton, or another member of the civil conspiracy set forth hereinabove, or by someone acting at her, his or their behest, of  confidential personnel records of the District, on or about June 10, 1999, containing disparaging statements concerning Robert to the editor of the Athol Daily News was outrageous conduct intolerable in a civilized society.

53.  The surveillance of Linda by Kleinhans, or another member of the civil conspiracy, or by someone acting at her or their behest, on or about June 16, 1999 was outrageous conduct intolerable in a civilized society.

54.  Kleinhans' maintenance of press clippings concerning the Harrises' 1989 lawsuit in Linda's personnel file was outrageous conduct intolerable in a civilized society.

55. The Defendants' conduct of a continuous campaign of retaliation and harassment for the Harrises' protected speech and petition activities was outrageous conduct intolerable in a civilized society.

56. Each of the above acts was intended to inflict emotional distress on Linda and Robert, or was committed with reckless indifference to the probability that they would cause emotional distress.

57. None of the above acts was justified by any legitimate reason.

58. Each of the above acts did inflict severe emotional distress, humiliation, embarrassment and fear on Linda and Robert.

### Count VI - Breach Of Contract

59. The plaintiff realleges the allegations of Paragraphs One through Fifty-eight above, and incorporates them herein by this reference as if set forth in full.

60. The acts of retaliation enumerated in Paragraph 24 and 27, above, and other, similar conduct by the Defendants were not in good faith and were otherwise unlawful.

61. The said acts constituted a breach of the Agreement.

62. The acts of retaliation enumerated in Paragraphs 24 and 27, above, and other, similar conduct by the Defendants constituted a failure of the consideration given by the Harrises for the said agreement.

63. As a direct and proximate result of the said breach, the Harrises have lost the benefit of their contract and have suffered severe emotional distress, humiliation, embarrassment and fear, injury to their family relationships and reputations, and have been otherwise injured.

### Count VII - Mass. Civil Rights Act:  G.L. c. 12 §11I

64.  The plaintiff realleges the allegations of Paragraphs One through Sixty-three above, and incorporates them herein by this reference as if set forth in full.

65.  The Defendants have engaged in the acts enumerated in Paragraphs 24 and 27 above, and other, similar conduct, in order to interfere, or attempt to interfere, with the Harrises' rights to freedom of speech and association, and to petition the government for redress of grievances, under the 1st Amendment to the Constitution of the United States and Part 1, Article XVI of the Constitution of the Commonwealth of Massachusetts.

66.  The said interference and attempted interference has been by threats, intimidation and coercion.

67.  As a result of the Defendants' said interference and attempted interference, the Harrises' speech has been chilled, and they have suffered severe emotional distress, humiliation, embarrassment, fear and injury to their family relationships and reputations.

### Count VIII - 42 U.S.C. §1983

68.  The plaintiff realleges the allegations of Paragraphs One through Sixty-seven above, and incorporates them herein by this reference as if set forth in full.

69.  The acts enumerated in Paragraphs 24 and 27 above and other, similar conduct violated the Plaintiffs' rights under the First Amendment to the Constitution of the United States.

70.  The Defendants have engaged in the acts enumerated in Paragraphs 26 and 29, above, and other, similar conduct under color of law.

71.  As a result of the Defendants' above violations of the Harrises' First Amendment rights, their speech has been chilled, and they have suffered severe emotional distress, humiliation, embarrassment, fear and injury to their family relationships and reputations.

### Count IX - Negligent Supervision And Retention

72.  The Plaintiff realleges the allegations of Paragraphs One through Seventy-one hereof, incorporating them herein by this reference as if set forth in full.

73.  At all relevant times, the School Committee has been aware that Kleinhans was engaging in a pattern or practice of retaliation against Robert and Linda for their exercise of First Amendment Rights.

74.  Despite that knowledge, the District has at all times negligently, willfully or intentionally failed to supervise Kleinhans by permitting her to engage in the above pattern or practice of retaliation.

75.  Despite that knowledge, the District has negligently, recklessly, willfully or intentionally failed to take remedial action:

> a.   to discipline Kleinhans for her retaliatory, arbitrary and capricious conduct; and
>
> b.   to prevent and control Kleinhans' further retaliatory, arbitrary and capricious conduct.

76.  Despite that knowledge, the District negligently, recklessly, willfully or intentionally retained Kleinhans in a position to continue her pattern or practice of retaliation.

77. As a direct and proximate result of the District's negligent, reckless, willful or intentional failure to supervise Kleinhans, and its negligent, reckless, willful or intentional retention of Kleinhans in a position to continue her pattern or practice of retaliation, the Harrises have suffered severe emotional distress, humiliation, embarrassment and fear, injury to their family relationships and reputations, and have been otherwise injured.

**WHEREFORE,** the Plaintiffs demand a jury trial and judgment:

1. Pursuant to G.L. c. 231A §§1 *et seq.*, declaring that the Defendants have violated the Harrises' rights under the First and Fourteenth Amendments to the United States Constitution and Part 1 Article XVI of the Constitution of the Commonwealth of Massachusetts; that they have interfered and attempted to interfere with the Harrises' exercise of such rights by threats, intimidation and coercion; that the individual defendants have conspired to defame Robert and lower his standing in the community for the purpose of effecting his removal as ATA President, and that the individual defendants have intentionally inflicted emotional distress upon the Harrises.

2. Prohibiting the Defendants and each of them from retaliating against the Harrises in any fashion for the 1989 litigation or for past or future exercise of their constitutional rights to free speech and association, and to petition the government for redress of grievances.

3. Requiring the Defendants and each of them to redact the Harrises' personnel records, removing all reference to disciplinary notices or actions which constituted retaliation for the Harrises' exercise of their constitutional rights to free speech and association and to petition the government for redress of grievances, and to restore to the Harrises all

duties, responsibilities, privileges and incidents of their positions at the time of the settlement of the 1989 litigation;

4. Awarding compensatory damages to Robert and Linda in an amount to be proved at trial.

5. Pursuant to 42 U.S.C. §1983, awarding punitive damages against Defendants Kleinhans Buxton, Guimond and Rabinowitz.

6. Pursuant to 42 U.S.C. §§1983 and 1988, and G.L. c. 12 §11I, awarding the Plaintiffs their reasonable attorneys fees and costs; and

7. For such other and further relief as the court may deem just and proper in the premises.

Respectfully submitted,

For the Plaintiffs,
LINDA and ROBERT HARRIS

By their attorney,

Vida K. Berkowitz, BBO #039720
McDonald & Associates
One Gateway Center
Suite 401 West
Newton, MA   02458-2806
Tel.:   (617) 928-0080

Dated:  March 14, 2000

## CERTIFICATE OF SERVICE

I, Vida K. Berkowitz, hereby certify that I have this day by first class mail, postage prepaid, served a copy of the foregoing "Second Amended Complaint And Demand For Jury Trial" upon John Foskett, Esq., Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, P.C., 99 Summer Street, 13th Floor, Boston, Massachusetts 02110-1235, attorney for defendants Athol-Royalston Regional School District Committee, Steven Buxton, Paul Guimond and Carla Rabinowitz; and Francis S. McGurrin, O'Brien & Von Rosenvinge, P.C., Wellesley Office Park, 20 William Street, Suite G-50, Wellesley, Massachusetts  02481, attorney for defendant Penelope Kleinhans.

Dated:  March 14, 2000

_____
Vida K. Berkowitz, Esq.